# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

---

SAMUEL R. HUMPHREYS,                    )
                                      )
        **Plaintiff,**         )
                                        )
**v.**                                    )       **No. 11-2514-STA-tmp**
                                        )
**BANK OF AMERICA CORP.; BAC** )
**HOME LOANS SERVICING, LP f/k/a** )
**COUNTRYWIDE HOME LOANS**  )
**SERVICING, LP, CORP.,**       )
                                        )
       **Defendants.**       )

---

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO AMEND THE COMPLAINT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

---

Before the Court is Plaintiff's Motion to Amend the Complaint (D.E. # 21), filed on February 13, 2012. Defendants filed a Response (D.E. # 22) on February 27, 2012. Also before the Court is Defendants' Motion to Dismiss (D.E. # 4), filed on June 29, 2011. Plaintiff filed a Response (D.E. # 16) on September 9, 2011. Defendants filed a Reply on September 23, 2011 (D.E. # 17). For the following reasons, Plaintiff's Motion is **GRANTED IN PART AND DENIED IN PART**, and Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

Plaintiff originally filed his Complaint in Shelby County Chancery Court on May 13, 2011. (D.E. # 1-1.) Defendants removed the case to this Court on June 22, 2011 (D.E. # 1), and

they filed the Motion to Dismiss now before the Court one week later on June 29, 2011. (D.E # 4.) In his Response, Plaintiff included two sentences requesting the Court to allow him the opportunity to amend the Complaint to adequately plead all causes of action. (Pl.'s Resp., D.E. # 16, at 3.) On January 30, 2012, the Court denied this one-sentence request to the extent that it constituted a Motion under the Federal Rules of Procedure. (D.E. # 20.) Plaintiff then filed a proper Motion to Amend the Complaint (D.E. # 21) on February 13, 2012. Defendants responded (D.E. # 22) on February 27, 2012. Plaintiff's Proposed Amended Complaint and the original Complaint are substantially similar, with the rewording of three to four paragraphs in the middle and the addition of two paragraphs at the end of the factual section constituting the main differences. A more notable difference is that Plaintiff asserted his intentional and negligent misrepresentation claims in separate Counts in the Proposed Amended Complaint, while the original Complaint did not specifically list them as Counts. The following facts are taken as true for purposes of this Order.

Plaintiff brings suit for fraud in the inducement of a loan transaction, violation of the Truth in Lending Act's ("TILA") Regulation Z, violation of the Tennessee Consumer Protection Act ("TCPA"), and intentional and negligent misrepresentation. (Proposed Am. Compl. ¶ 102-120.) In his Prayer for Relief, Plaintiff includes a prayer for rescission of the loan agreement at issue, damages, and a permanent injunction enjoining Defendants from collecting payments from Plaintiff and attempting to foreclose on his property. (*Id.* at 17.) Plaintiff divides the factual support for his Proposed Amended Complaint and original Complaint into two sections, the first section containing statements about Defendants' general mortgage-related practices in the years before and after the stock market's upheaval in the fall of 2008, with the second section

addressing Defendants' actions regarding Plaintiff specifically. The Court will address the former before the latter.

## Overview of Countrywide's Actions

In 2004, Countrywide Home Loans Servicing, LP, Corp. ("Countrywide") tried to maximize its profits by doubling its share of the national mortgage market by mass producing loans for sale on the secondary market. (*Id.* ¶ 7.) This strategy followed a national trend in which lenders began to generate as many mortgages as possible for sale on the secondary market. (*Id.* ¶ 8.) Countywide used misleading market practices designed to sell risky, high-cost home loans to homeowners who did not understand the dangers and excessive costs of the loans. (*Id.* ¶ 9.) Plaintiff concludes that Countrywide engaged in deceptive practices when it claimed to be the nation's largest lender so as to build trust with consumers; encouraged borrowers to refinance with complicated mortgage instruments such as payment option adjustable rate mortgages ("Pay Option ARMs"), which are difficult for consumers to understand; and marketing these complex loan products by advertising low teaser rates while obfuscating or misrepresenting later steep monthly payment and interest rate increases. (*Id.* ¶ 10, 44.) Specifically, Countrywide misrepresented the length of time that the interest rate would be fixed, the fact that the payment rate differed from the interest rate, and that the minimum payment would not last for the life of the loan. (*Id.* ¶ 44.)

Countrywide aggressively marketed Pay Option ARMs after 2003. (*Id.* ¶ 25.) Pay Option ARMs offer a low "teaser" rate for a period of one to three months, and at the end of that introductory period, the interest rate increases dramatically. (*Id.* ¶ 26.) Countrywide's Pay Option ARMs' interest rates could change monthly; most adjustable rate loans' interest rates

could change once a year.  (*Id.* ¶ 27.)  Countrywide's Pay Option ARMs also allowed borrowers

to make limited or minimum payments when their interest rate changed within a certain time

frame.  (*Id.* ¶ 28.)  Payment of this minimum payment was frequently insufficient to cover the

interest payment, which resulted in negative amortization.  (*Id.*)  The minimum payments

remained the same for one year and then increased by 7.5% each year for the next four years.

(*Id.* ¶ 29.)

At the fifth year, payments are recast to be fully amortizing over the remaining term of

the loan, which causes a substantial jump in payments.  (*Id.* ¶ 30.)  This sudden increase in

payment amounts results in "payment shock" for unsuspecting borrowers.  (*Id.*)  Countrywide

usually placed negative amortization caps on its Pay Option ARMs, which were usually 115% of

the original loan's principal.  (*Id.* ¶ 31.)  Once a borrower reached this cap, the monthly payment

grew to an amount which would fully amortize to pay off the loan over its remaining term.  (*Id.* ¶

32.)  This increase also resulted in payment shock for unsuspecting borrowers.  (*Id.* ¶ 33.)

Nearly all of Countrywide's Pay Option ARM borrowers experienced payment shock: at the end

of 2006, 88% of the loans in its Pay Option ARM portfolio had experienced negative

amortization.  (*Id.* ¶ 38.)

Alternatively, a Pay Option ARM provided borrowers with the option to make interest-

only payments for the first five years of the loan.  (*Id.* ¶ 34.)  After the first five years, payment

shock would occur when the loan recast to cover principal and interest over the remaining term

of the loan.  (*Id.*)  A majority of Countrywide borrowers made minimum payments which would

pay off the indebtedness over a fifteen-year or thirty-year amortization schedule.  (*Id.* ¶ 35.)

Countrywide received complaints from borrowers who did not understand their loans and

suffered from payment shock, but it did not stop marketing Pay Option ARMs.  (*Id.* ¶ 45.)  Due

to this payment shock arising from Countrywide's "inherently dangerous and deceptive" tactics,

many borrowers have lots their homes to foreclosure, and many more an in jeopardy of

foreclosure.  (*Id.* ¶ 46.)

Countrywide also created a high-pressure sales environment which forced branch

managers and loan officers to meet high production goals and close as many loans as possible,

leading them to push the riskiest kinds of loans, such as Pay Option ARMs, by drawing

borrowers' attention to the initial low monthly payments.  (*Id.* ¶ 11-12, 42-43.)  This scheme's

primary goal was to provide the secondary market with as many loans as possible with the

highest premiums possible.  (*Id.* ¶ 13.)  During the underwriting process, Countrywide did not

consider whether borrowers would be able to afford monthly payments when the loan recast to

an amortizing monthly payment.  (*Id.* ¶ 37.)

Most of Countrywide's loans were sold as mortgage-backed securities or whole loan

pools, and Pay Option ARMs with high interest rates were among the most demanded loans to

fill the pools.  (*Id.* ¶ 14.)  In a typical securitization transaction, loans were pooled together and

transferred to a trust controlled by the securitizer.  (*Id.* ¶ 16.)  The trust would then sell securities

backed by the loans in the pool, and the securities' holders obtained the right to a portion of

revenue from the pooled loans.  (*Id.*)  These securitizations operated on a large scale, often

pooling thousands of loans and selling thousands of shares.  (*Id.*)

Additionally, Countywide often retained the right to service the loans it pooled or sold,

and the fees for servicing the loans drove its profits higher.  (*Id.* ¶ 15.)  Under this system,

Countrywide experienced rapid growth in its securities trading volume, which grew from $647

billion in 2000 to $3.8 trillion in 2006. (*Id.* ¶ 17.) This growth led Countrywide's business model to focus on creating a larger volume of the types of loans demanded by investors; it thus began to foward-sell loans before they were funded. (*Id.* ¶ 18-19.) For example, Countrywide would agree to deliver 2,000 Pay Option ARMs to a purchaser two months later. (*Id.* ¶ 20.) These transactions were based upon high-ranking Countywide officials' ability to monitor loans in production and conform the loans made to agreements already entered into. (*Id.*) This forward-selling system led to confusion as to the ownership of individual loans to the detriment of both consumers and investors. (*Id.* ¶ 21.)

As part of these loan pool sales, Countrywide would retain possession of promissory notes and other related security agreements after the sale of loans into a loan pool for the secondary market. (*Id.* ¶ 22.) However, the standard pooling and servicing agreement required the seller to reassign the critical documents to the purchaser within a fixed period of time, usually between forty-five and ninety days. (*Id.* ¶ 23.) Countrywide's failure to reassign the critical documents has "thrown into question" the ownership of thousands of Countywide loans which were placed in the secondary market. (*Id.* at 24.)

Countrywide sold thousands of Pay Option ARMs; in 2005, 19% of the loans it originated were Pay Option ARMs. (*Id.* ¶ 39.) Pay Option ARMs proved profitable for Countrywide. (*Id.* ¶ 40.) Its gross profit margin of 4% for Pay Options ARMs was double its 2% profit margin on mortgages guaranteed by the Federal Housing Administration. (*Id.*) For example, through the end of 2007, the negative amortization on Countrywide's loans generated $1.2 billion dollars of income. (*Id.* ¶ 41.) Bank of America ("BOA") acquired Countrywide in 2008, and BOA now services Countrywide's loans.

## Facts Related to Plaintiff's Mortgage

Plaintiff, an "experienced financial advisor," first bought the home at issue in this case ("the Residence") in 1984, and he took out an equity loan from Wells Fargo Home Mortgage ("Wells Fargo") at some point in time. (*Id.* ¶ 48, 52.) In May of 2004, Plaintiff owed approximately $686,000 on his mortgage with Wells Fargo, and he faced maturity of the loan. (*Id.* ¶ 49.) He believed the Residence would be worth approximately $1 million after he completed certain renovations. (*Id.* ¶ 50.) Thus, Plaintiff became interested in refinancing the Residence to use some of his home equity to finance home improvement work and other projects. (*Id.* ¶ 51.) After hearing about Pay Options ARMs and reading Countrywide's promotional material about their attractiveness to customers, he became interested in obtaining one. (*Id.* ¶ 52.) In response to these promotional materials, Plaintiff contacted a local Countrywide office about the Pay Option ARM. (*Id.* ¶ 53.) He was attracted to his ability to pay a "limited payment" under the Pay Option ARM. (*Id.* ¶ 55.) In light of his financial position and plans, Plaintiff wanted to make the lowest monthly payments possible on his mortgage, even if those initial low payments resulted in a large balloon payments at the end of the mortgage. (*Id.* ¶ 56.) When Plaintiff spoke with Yvonne Winsett ("Winsett") at the Countrywide office, she led or allowed him to believe that the Pay Option ARM would meet these needs by allowing him to make low monthly payments on the loan. (*Id.* ¶ 54, 57.)

Winsett emphasized the low interest rates available at the outset of the loan, but she did not tell Plaintiff that his payments would increase by at least 7.5% annually and that they would increase dramatically in five years when the loan was recast to become an amortizing loan. (*Id.* ¶ 58.) Nor did she inform Plaintiff that his interest rate would change monthly while the

minimum payment would change annually, leaving great potential for negative amortization. (*Id.* ¶ 59.)  Plaintiff did not know that Winsett, like other loan officers or originators, was pressured or offered financial incentives to push customers toward Pay Option ARMs by misleading borrowers or obfuscating the loans' true terms.  (*Id.* ¶ 60.)  Nor did he realize that Countrywide's primary reason for promoting the Pay Option ARM to him was to fill loan pools for sale on the secondary market.  (*Id.* ¶ 61.)

On May 14, 2004, Plaintiff agreed to refinance his home mortgage loan with Countrywide.  (*Id.* ¶ 63.)  The new loan ("the Mortgage") was for $800,000 with a term of thirty years.  (*Id.*  ¶ 64.)  He received approximately $100,000 at closing after he paid off the principal owed on the loan to Wells Fargo.  (*Id.*)  Plaintiff's promissory note was an adjustable rate note with annual change dates computed through the "Twelve Month Average of Treasury Yields" published annually by the Federal Reserve Board.  (*Id.* ¶ 65.)  The Mortgage's initial interest rate was 1.250%, and the maximum payable interest rate was capped at 9.950%.  (*Id.* ¶ 66.)  Plaintiff's first payment was due on July 1, 2004, and his monthly payments for the first year were $2,666.01 per month.  (*Id.* ¶ 67.)  Based on the representations provided by Winsett and the promotional materials, Plaintiff believed he was getting a loan with the option of making interest-only payments or paying on the principal of the loan.  (*Id.* ¶ 74.)

Plaintiff understood that his payments for the following year would be based on this interest rate.  (*Id.* ¶ 68.)  He was given the option to choose an index by which his interest rate would be calculated, and he "paid great attention" to selecting an index which he thought would minimize his interest payments.  (*Id.* ¶ 69.)  Despite his financial expertise, Plaintiff did not understand that his interest rate would change on a monthly basis even though his monthly

payment would not change for the first year of the Mortgage. (*Id.* ¶ 70.) "Although he read the [Mortgage] documents as thoroughly as possible," Plaintiff did not understand that his minimum payment would increase by 7.5% each year regardless of which interest rate index he selected. (*Id.* ¶ 71.) Nor did Plaintiff understand that after five years his loan would be converted into a fully amortizing loan, and that he would be required to pay the principal and any unpaid interest from negative amortization over the remaining twenty-five years of the Mortgage. (*Id.* ¶ 72.) If Plaintiff had understood these terms, he would not have entered into the Mortgage. (*Id.* ¶ 73.) Plaintiff avers that he did not learn of "some of the most critical terms of his loan," including the Mortgage's recasting to a twenty-five year amortizing loan at a higher balance than he agreed to five years earlier, until the summer of 2010. (*Id.* ¶ 101.)

Plaintiff's payments on the Mortgage increased as detailed in the following table. Plaintiff received notification of the increases in May of each year, and the increase would take effect in July of each year. (*See id.* ¶ 67.) This information is taken from Paragraphs 75-82 of the Proposed Amended Complaint. Information missing from the Proposed Amended Complaint is represented by dashes.

| Date | Minimum Monthly Payment | Increase from May 2004 Minimum Monthly Payment | Amount of Principal | Increase from May 2004 Principal |
|---|---|---|---|---|
| May of 2004 | $2,666.01 | - | $800,000.00 | - |
| May of 2005 | $2,865.96 | $199.95 | - | - |
| May of 2006 | $3,080.91 | $414.90 | $801,939.29 | $1,939.29 |
| May of 2007 | $3,311.98 | $645.97 | $818,393.03 | $18,393.03 |
| May of 2008 | $3,560.38 | $894.37 | $832,823.46 | $32,823.46 |

| | | | | |
|---|---|---|---|---|
| May of 2009 | $4,024.19 | $1,358.18 | - | - |

Since 2009, Plaintiff's payments have not increased because the interest rate calculated under his chosen index has declined. (*Id.* ¶ 83.) Plaintiff has remained current on all of his payments, but he has been damaged by large payment increases and payment shock, which have affected his ability to pay on other obligations. (*Id.* ¶ 85.) Plaintiff avers that he is in "serious jeopardy" of losing his home to foreclosure because he may not be able to continue his current payments, and he could face a significant payment increase if interest rates begin to climb. (*Id.* ¶ 86.)

When Plaintiff received notice of payment increases listed in the table above, he reached out to Wells Fargo[1] in an effort to understand why his payments were increasing. (*Id.* ¶ 87.) He then heard about federal assistance given to banks which gave loan modifications to distressed borrowers. (*Id.* ¶ 88.) Plaintiff also learned of Countrywide's lending practices, including investigations of fraud by government agencies. (*Id.* ¶ 89.) He learned that settlements between government officials and Countrywide gave consumers, such as himself, rights regarding modification of their mortgages. (*Id.* ¶ 90.) In the meantime, BOA had set up a loss mitigation department ("the Loss Mitigation Department") through which requests for loan modification could be processed. (*Id.* ¶ 92.)

Therefore, Plaintiff contacted Memphis Area Legal Service's Home Preservation Project ("the Home Preservation Project"), a certified foreclosure counseling agency, for assistance in the modification of the Mortgage. (*Id.* ¶ 91.) Neither Plaintiff nor his foreclosure counsel at the

---

[1] While Plaintiff avers that he tried to speak with Wells Fargo, the Court believes he meant Countrywide, as Plaintiff paid off his loan with Wells Fargo in 2004.

Home Preservation Project received a meaningful response to his requested for modification of the Mortgage. (*Id.* ¶ 93.) The Loss Mitigation Department did not formally deny or reject his request for modification or restructuring of the Mortgage. (*Id.* ¶ 94.)

Additionally, Plaintiff believes he was eligible for a modification of the Mortgage through the Home Affordable Mortgage Program ("HAMP"). (*Id.* ¶ 95.) The Department of the Treasury created HAMP on March 4, 2009, to reduce mortgage payments and provide other relief for mortgage borrowers at risk of foreclosure. (*Id.* ¶ 96.) Plaintiff also believes that he is entitled to relief through a settlement agreement between Countrywide and the Tennessee Attorney General ("the Attorney General") regarding the Attorney General's complaint about Countrywide's deceptive lending practices.[2] (*Id.* ¶ 97.) On January 22, 2009, the Attorney General brought an action against Countrywide and other defendants for violating the TCPA by placing borrowers in loan agreements such as Pay Option ARMs. (*Id.* ¶ 98.) In the Agreed Final Judgment in *Tennessee v. Countrywide Fin. Corp.*, Countrywide and BOA agreed to provide a wide spectrum of relief to Tennessee homeowners who had received Pay Option ARMs and other risky and exploitive loan products from Countrywide. (*Id.* ¶ 99.)

Plaintiff has received none of this relief from BOA's Loss Mitigation Department, even asking for relief pursuant to *Tennessee v. Countrywide Fin. Corp.* (*Id.* ¶ 100.) Rather, he believes that Countrywide and BOA have asked him to furnish financial information multiple times as a stalling tactic. (*Id.*)

## STANDARD OF REVIEW

---

[2] The case, filed in Davidson County's Circuit Court, is *State of Tennessee* ex rel. *Cooper v. Countrywide Financial Corp.*, No. 09C202.

Under Federal Rule of Civil Procedure 15(a)(2), a pleading may be amended "only by leave of court . . . and leave shall be freely given when justice so requires."[3] A motion to amend a complaint should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the nonmovant, or futility.[4] A trial court may appropriately assess the legal sufficiency of a contemplated amendment in considering the propriety of granting leave to amend under Fed. R. Civ. P. 15(a) and deny the motion if amendment would be futile.[5] Amendment would be futile if the proposed amended complaint would fail to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). Because Defendants have argued that Plaintiff's Proposed Amended Complaint cannot withstand a motion to dismiss, the Court will proceed with Rule 15(a)(2)'s futility analysis and evaluate the Proposed Amended Complaint under Rule 12(b)(6).

A defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pled factual allegations of the complaint as true, construe those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the plaintiff.[6] However, legal conclusions "masquerading as factual allegations" or unwarranted factual inferences including "conclusory

---

[3]    Fed. R. Civ. P. 15(a)(2).

[4]    *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 519 (6th Cir. 2001).

[5]    *Id.* (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

[6]    *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2007).

allegations" need not be accepted as true.[7]  To avoid dismissal under Rule 12(b)(6), "the

complaint must contain either direct or inferential allegations" with respect to all material

elements of the claim.[8]

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a

short and plain statement of the claim showing that the pleader is entitled to relief[.]"[9]  Although

this standard does not require "detailed factual allegations," it does require more than "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action."[10]  To survive a

motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a

right to relief above the speculative level" and to "state a claim to relief that is plausible on its

face."[11]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[12]

## ANALYSIS

In his Motion to Amend, Plaintiff cites to Tennessee state law and argues that Tennessee

state courts "generally allow amendment as an alternative to dismissal, unless amendment would

---

[7]     *Id.*

[8]     *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir.
2007).

[9]     Fed. R. Civ. P. 8(a)(2).

[10]     *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1953 (2009); *Bell Atlantic Corp. v. Twombly,*
550 U.S. 544, 555 (2007); *see also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir.
2009).

[11]     *Iqbal*, 129 S. Ct. at 1949-50; *Twombly*, 550 U.S. at 570.

[12]     *Iqbal,* 129 S. Ct. at 1949.

be futile and would not save a claim."[13]  However, federal courts apply federal procedural law when they are sitting by virtue of federal question jurisdiction with supplemental jurisdiction over state law claims.[14]  Thus, the Court agrees with Defendants' argument that Plaintiff's reliance on Tennessee state case law regarding the Court's evaluation of his Motion to Amend is "generally irrelevant."[15]

## Fraud in the Inducement of the Loan Transaction

### Motion to Amend the Complaint

In the Proposed Amended Complaint, Plaintiff states that Defendants induced him to enter into the Mortgage by a complex scheme to mislead him about the real nature of Pay Option ARMs as part of a plan to sell thousands of loans on the secondary mortgage market.[16]  He reasonably relied on active misrepresentations and concealment by Countrywide and its agent, Winsett, which fraudulently induced him to enter into a "very toxic and exploitive loan agreement."[17]

In their Response to Plaintiff's Motion to Amend, Defendants point out that this Count of Plaintiff's Proposed Amended Complaint contains the same information as the original Complaint, as it merely identified Winsett as Countrywide's agent.[18]  Accordingly, Defendants

---

[13]    (Pl.'s Mot., D.E. # 21-1, at 3.)

[14]    *See generally Erie R.R. v. Tompkins*, 304 U.S. 64 (1938);

[15]    (Defs.' Resp., D.E. # 22, at 4.)

[16]    (Proposed Am. Compl. ¶ 103.)

[17]    (*Id.* ¶ 104.)

[18]    (Defs.' Resp., D.E. # 22, at 4.)

rely on their arguments in the Motion to Dismiss.[19]  Therefore, the Court will turn to the Motion

to Dismiss and its subsequent briefing to determine whether permitting Plaintiff's fraud in the

inducement claim would survive a motion to dismiss.

## Motion to Dismiss

Tennessee courts determine which statute of limitations to apply to a particular claim by

examining the gravamen of the complaint.[20]  To determine the gravamen of a complaint, courts

look to the basis for which damages are sought.[21]  An individual induced by fraud to enter into an

agreement may elect two remedies: he may treat the agreement as voidable and sue for

rescission, or he may treat the agreement as existing and sue for damages at law under a tort

theory grounded in deceit.[22]  Neither Plaintiff's Proposed Amended Complaint nor his original

Complaint identify whether he is requesting rescission as a remedy for his fraud in the

inducement claim; indeed, he does not state which legal theories would give him the rescission

he requests.  Therefore, the Court interprets Plaintiff's Proposed Amended Complaint in his

favor and finds that he has requested rescission of the Mortgage under all five of his asserted

Counts.

As stated by the Tennessee Supreme Court, fraud in the inducement of a contract has a

three-year statute of limitations.[23]  An action for breach of contract will ordinarily carry a six-

---

[19]  (*Id.* at 4-5.)

[20]  *Vance v. Schulder*, 547 S.W.2d 927, 931 (Tenn. 1977).

[21]  *Keller v. Colgems-EMI Music, Inc.*, 924 S.W.2d 357, 359 (Tenn. Ct. App. 1996).

[22]  *Vance*, 547 S.W.2d at 931.

[23]  Tenn. Code Ann. § 28-3-105; *Vance*, 547 S.W.2d at 931-32; *Am. Fid. Fire Ins. Co. v. Tucker*, 671 S.W.2d 837, 841 (Tenn. Ct. App. 1983).

year statute of limitations.[24]  However, an action "at law or in equity" for the recovery of lands has a seven-year statute of limitations.[25]  Section 28-2-103 is titled "Adverse possession; time; extent."[26]  Thus, because Plaintiff filed his Complaint one day shy of seven years after he entered into the Mortgage, whether Plaintiff's fraud in the inducement claim survives will depend in large part upon which statute of limitations the Court applies.

In their Motion to Dismiss, Defendants argue that Plaintiffs' fraud in the inducement claim is untimely.[27]  They argue that the alleged fraud must have occurred on or before the Mortgage's closing date to induce Plaintiff to enter into the Mortgage; thus, they assert that at the latest, any fraud in the inducement took place on May 14, 2004, the Mortgage's closing date.[28]  The Complaint was filed on May 13, 2011, seven years after Plaintiff signed the Mortgage.  Defendants submit that fraud in the inducement of a contract claim carries a six-year statute of limitations but that, alternatively, the Court could apply Tennessee's three-year statute of limitations for injury to real property.[29]  Regardless, under either statute of limitations, Defendants submit that Plaintiff's fraud in the inducement claim is time-barred.

In response, Plaintiff states that Tennessee case law applies a seven-year statute of limitations to actions for rescission based upon fraud in the inducement of a transfer of an

---

[24]     Tenn. Code Ann. § 28-3-109(a).

[25]     *Id.* § 28-2-103(a).

[26]     *Id.*

[27]     (Defs.' Mot. to Dismiss, D.E. # 4-1, at 5.)  The Court notes that Defendants do not assert that Plaintiff has failed to state a claim for fraud in the inducement.

[28]     (*Id.* at 6.)

[29]     (*Id.*)

interest in real property.[30]  As such, Plaintiff ties his request for rescission, found in his Prayer for Relief, to his fraud in the inducement claim and argues that his claim for rescission was timely filed and should go forward.[31]  In reply, Defendants argue that "[t]he fact that the Complaint is not clear on whether Plaintiff [seeks] damages or rescission under the claim for fraud in the inducement is the very essence of failure to state a claim" under the Federal Rules of Civil Procedure.[32]  Additionally, Defendants assert that a fraud in the inducement claim does not equate to a fraudulent conveyance claim and that the seven-year statute of limitations does not apply.[33]  Defendants reassert that Plaintiff's claim is time-barred under either the three- or six-year statute of limitations they mentioned in their initial Motion "regardless of whether the relief requested is for damages or rescission."[34]

      The Court will eliminate possible statutes of limitations until it arrives at the appropriate statute of limitations.  First, the Court finds that the six-year breach of contract statute of limitations is inapplicable to this portion of Plaintiff's claim; Plaintiff does not allege that Defendants breached the Mortgage but rather that they fraudulently induced him to enter into the Mortgage.  This fraudulent inducement, occurring before the Mortgage existed, is not equivalent to a breach of contract.  Thus, the six-year breach of contract statute of limitations does not apply.

---

[30]     (Pl.'s Resp., D.E. # 16, at 5.)

[31]     (*Id.* at 6.)

[32]     (Defs.' Reply, D.E. # 17, at 2.)

[33]     (*Id.*)

[34]     (*Id.*)

Second, the Court finds that the seven-year statute of limitations for fraudulent conveyances put forth by Plaintiff does not apply. The title of the section cited by Plaintiff guides the Court's interpretation of the section's provisions; by its title alone, it relates to adverse possession. Plaintiff's fraud in the inducement claim is not a claim for adverse possession. Nor does it relate to the recovery of lands; at most, Plaintiff would receive the money he has paid into the Mortgage and be relieved of the burden of making payments under the Mortgage, but he would not recover title to the Residence or the land upon which it sits. Moreover, Plaintiff has not argued that the Mortgage itself was fraudulent; instead, he argues that the fraud and misrepresentation occurred leading up to the signing of the Mortgage. Accordingly, the Court finds that the seven-year adverse possession statute of limitations does not apply to this case.

Thus, the Court is left with the three-year statute of limitations for fraud in the inducement of a contract. The Court finds that this statute of limitations applies. As Plaintiff entered into the Mortgage on May 14, 2004, any fraud in the inducement had to have taken place on or before that date. Plaintiff filed suit on May 13, 2011. Therefore, at first glance, it appears that Plaintiff's fraud in the inducement claim is untimely. However, the Court must apply the discovery rule to Plaintiff's claim. The discovery rule tolls the statute of limitations until the plaintiff, in the exercise of reasonable diligence, should have been aware of facts sufficient to put him or her on notice that he or she suffered an injury as a result of wrongful conduct.[35]

---

[35]    *Shadrick v. Coker*, 963 S.W.2d 726, 733 (Tenn. 1998).

18

Moreover, whether a plaintiff exercised reasonable care and diligence in discovering the injury or wrong is usually a factual issue.[36]

Although Plaintiff did not rely on the discovery rule in his Motion to Amend the Complaint or in his Response to Defendants' Motion to Dismiss, the Court finds it prudent to apply the discovery rule in this case. Thus, for Plaintiff's fraud in the inducement claim to survive, Plaintiff would reasonably have had to be on notice of the accrual of his cause of action after May 13, 2008. In his Proposed Amended Complaint and the original Complaint, Plaintiff states that he "did not learn of some of the most critical terms of his loan . . . until [the] summer of 2010."[37] Neither party briefed the discovery rule's applicability: they focused their arguments on which statute of limitations to apply.

Even viewing the assertions in the original Complaint and Proposed Amended Complaint in the light most favorable to Plaintiff, the Court finds that Plaintiff's fraud in the inducement claim is untimely. The Court accepts Plaintiff's assertion that he "read the documents as thoroughly as possible," and the statute of limitations was tolled at the signing of the Mortgage. However, even accepting Plaintiff's assertion that he did not "learn of some of the most critical terms of his loan . . . until the summer of 2010" as true, the Court finds that the statute of limitations was not tolled until 2010. Whether Plaintiff knew of some of the most critical terms of his loan is irrelevant to the Court's inquiry under the law: when Plaintiff, or a reasonable person in Plaintiff's place, reasonably should have known of facts sufficient to put him on notice that he had accrued a cause of action.

---

[36]     *Sherrill v. Souder*, 325 S.W.3d 584, 596-97 (Tenn. 2010).

[37]     (Proposed Am. Compl. ¶ 101; Compl. ¶ 99.)

The Court finds that Plaintiff reasonably should have been on notice of the alleged fraud in May of 2005, when he received the first notification that his payments would increase, and he certainly should have been on notice in May of 2006, when he received the second notification of an increase in his monthly mortgage payments. Therefore, the Court finds that in the exercise of reasonable diligence, Plaintiff should have known about the fraud in the inducement of the Mortgage in May of 2006. Therefore, for his fraud in the inducement claim to be timely, he would have had to sue by May of 2009. However, Plaintiff filed suit in May of 2011, two years too late.

Thus, the Court finds that Plaintiff's fraud in the inducement claim as asserted in his Proposed Amended Complaint would be time barred, and amendment of the original Complaint would be futile. Accordingly, Plaintiff's Motion to Amend the Complaint in this regard is **DENIED**. Because Plaintiff's original Complaint would be similarly time-barred, Defendant's Motion to Dismiss this claim is **GRANTED**.

## Violation of Regulation Z of TILA

In his Proposed Amended Complaint, Plaintiff alleges that Defendants violated Regulation Z of TILA by "[b]y failing to notify [him] of the change in ownership of [his] [M]ortgage."[38] The original Complaint contained the exact same language.[39] In their Response to Plaintiff's Motion to Amend, Defendants note that Plaintiff did not amend his TILA claim and therefore "rest on their previous arguments in their Motion to Dismiss."[40] Thus, the Court turns

---

[38]     (Proposed Am. Compl. ¶ 106.)

[39]     (Compl. ¶ 104.)

[40]     (Defs.' Resp., D.E. # 22, at 5.)

to Defendants' Motion to Dismiss and the other response and reply briefs in its evaluation of Plaintiff's TILA claim in both his original and Proposed Amended Complaint.

<u>Facial Validity of the Claim</u>

The section of TILA addressing the liability of assignees provides in pertinent part that "[i]n addition to other disclosures required by this subchapter, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer . . . ."[41] Thus, § 1641(g) provides the statutory parallel to 12 C.F.R. § 226.39 mentioned in the Amended Complaint.[42]

In their Motion, Defendants argue that Plaintiff's Complaint does not contain facts alleging when they failed to notify him of the change in ownership of his Mortgage and that he failed to identify from and to whom the Mortgage passed.[43] Defendants also point out that

---

[41]     15 U.S.C. § 1641(g)(1).

[42]     *See id.* 12 C.F.R. § 226.39 governs mortgage transfer disclosures when an "owner of an existing mortgage loan [acquires] legal title to the debt obligation, whether through a purchase, assignment or other transfer." 12 C.F.R. § 226.39(a)(1). Under this regulation, "covered person[s]" are required to disclose "on or before the thirtieth calendar day following the date of transfer" the following:

> the name, address, and telephone number of the covered person . . . , the date of transfer . . . , the name, address, and telephone number of an agent or party authorized to receive notice of the right to rescind and resolve issues concerning the consumer's payments on the loan, . . . [and] where transfer of ownership of the debt to the covered person is or may be recorded in public records or, alternatively, that the transfer of ownership has not been recorded in public records at the time the disclosure is provided.

*Id.* § 226.39(b); 226.39(d)(1)-(4).

[43]     (Defs.' Mot. to Dismiss, D.E. # 4-1, at 6.)

Plaintiff does not identify when the change in ownership occurred and that they had no obligation to notify him of a change in ownership prior to Regulation Z's enactment.[44]

In response, Plaintiff states that he is caught in a Catch-22 type of situation: he does not know the exact date of the transfer of the Mortgage from Countrywide to BOA, but that information is "totally within the control of . . . Defendants."[45]  Plaintiff points out that he alleged that most Pay Option ARMs originated by Countrywide were sold onto the secondary market and that Countrywide was acquired by Defendants; accordingly, he implies that his Mortgage changed ownership at some point in time.[46]  Plaintiff notes that BOA acquired Countrywide in 2008, providing at least one date for a potential change in ownership of the Mortgage.

In reply, Defendants point out that Plaintiff could have submitted a Qualified Written Request under the Real Estate Settlement Procedures Act at any time to find out the identity of the owner of the loan.[47]  Thus, Defendants imply that Plaintiff does not have sufficient facts to support his TILA change in ownership claim due to his own lack of action.[48]

After viewing Plaintiff's allegations in the light most favorable to him, the Court finds that the Proposed Amended Complaint and the original Complaint successfully state a facial claim under TILA and Regulation Z.  Plaintiff alleges that he does not know the exact date of the

---

[44]     (*Id.*)

[45]     (Pl.'s Resp., D.E. # 16, at 7.)

[46]     (*Id.*)

[47]     (Defs.' Reply, D.E. # 17, at 3.)

[48]     (*Id.*)

Mortgage's transfer from Countrywide to BOA, but the Court expects that such information would become available during discovery. Plaintiff is not required to plead specific information he does not have. He pled that the Mortgage changed owners and he was not notified in violation of Regulation Z and TILA; accordingly, he has set forth the elements of a claim under TILA and Regulation Z. Therefore, Plaintiff's Motion to Amend the Complaint is **GRANTED** in this regard, and Defendant's Motion to Dismiss is **DENIED**.

## Statute of Limitations

Section 1641 limits assignees' damages and provides that they "may not exceed with respect to actions based upon a violation of [§ 1641], the amount specified in [§] 1640 of this title; and with respect to all other causes of action, the sum of the amount of remaining indebtedness . . . and the total amount paid by the consumer in connection with the transaction."[49] Damages under § 1640 for "fail[ing] to comply with any requirement imposed under this part, including any requirement under [§] 1635 of this title [or] subsection (f) or (g) of [§] 1641 of this title" include liability "in an amount equal to the sum of any actual damage sustained by [any creditor] as a result of the failure [and] twice the amount of any finance charge in connection with the transaction."[50] Notably, "[a]ny action under [§ 1640] may be brought in any . . . court of competent jurisdiction within one year from the date of the occurrence of the violation."[51] The Sixth Circuit has characterized § 1640(e) as a statute of limitations, thereby

---

[49] 15 U.S.C. § 1641(d)(1)-(2).

[50] *Id.* § 1640(a)(1)-(2).

[51] *Id.* § 1640(e).

rendering the discovery rule applicable.[52]  As stated above, when a plaintiff accrued a cause of action under the discovery rule is generally a factually-based inquiry.[53]

In their Motion, Defendants argue that any claim for damages under TILA is barred by the one-year statute of limitations, as Plaintiff did not provide sufficient facts with which Defendants can ascertain whether the damages remedy would be time-barred.[54]  In his Response, Plaintiff does not directly address this argument; neither do Defendants in their Reply.

Because the Court has permitted Plaintiff's TILA claim to go forward, it will not dismiss it on statute of limitations grounds at this time.  The Court finds that although the original and Proposed Amended Complaints do not state a specific date when the Mortgage changed owners, they also do not contain a date which would affirmatively demonstrate that Plaintiff has sued outside the one-year statute of limitations.  Therefore, because it is not apparent from the face of the original Complaint or the Proposed Amended Complaint that Plaintiff's TILA claim is untimely, Plaintiff's Motion to Amend the Complaint is **GRANTED** in this regard, and Defendant's Motion to Dismiss is **DENIED**.

<u>Availability of Rescission</u>

Notably, TILA provides for a right to rescission "as to certain transactions."[55]  Section 1635 addresses the situations in which obligors may rescind agreements under TILA.  First, obligors "shall have the right to rescind the transaction until midnight of the third business day

---

[52]     *Wike v. Vertrue, Inc.*, 566 F.3d 590, 595 (6th Cir. 2009) (citing *Weston v. AmeriBank*, 265 F.3d 366, 368 (6th Cir. 2001)).

[53]     *See Sherrill*, 325 S.W.3d at 596-97.

[54]     (Defs.' Mot. to Dismiss, D.E. # 4-1, at 7.)

[55]     *See id.* § 1635.

following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later."[56]  Other than this three-day rescission window, obligors have three years from the date of consummation to rescind the transaction if the creditor fails to provide the required notice of the right to rescind or TILA's material disclosures.[57]  Section 1635(f) "completely extinguishes the right of rescission at the end of the three-year period."[58]

In their Motion, Defendants assert that rescission of the Mortgage is time-barred, as the right to rescind under TILA expires three years after the Mortgage was signed.[59]  In his Response, Plaintiff does not address Defendants' rescission argument.  In their Reply, Defendants do not re-raise the issue of rescission.

The Court finds that rescission is unavailable as a remedy for any violation of TILA Plaintiff may ultimately prove.  Plaintiff signed the Mortgage on May 14, 2004, and he filed suit on May 13, 2011.  Under TILA, Plaintiff needed to rescind the Mortgage within three years of signing it, and even then, he would have had the right to rescind only if Defendants had failed to provide the required notice of the right to rescind or TILA's material disclosures.  Plaintiff has not asserted that Defendants failed to provide these materials.  Accordingly, the Court finds that

---

[56]     *Id.* § 1635(a).

[57]     *See id.* § 1635(f); 12 C.F.R. § 226.23(a)(3).  "Material disclosures" are "the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§ 226.32(c) and (d) and 226.35(b)(2)."  12 C.F.R. § 226.23(a)(3) n.48.

[58]     *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998).

[59]     (Defs.' Mot. to Dismiss, D.E. # 4-1, at 7.)

Plaintiff's request for rescission seven years after signing the Mortgage is time-barred under

TILA's three-year statute of limitations on rescission. Therefore, Plaintiff's Motion to Amend

the Complaint is **DENIED** in this regard, and Defendants' Motion to Dismiss rescission as a

remedy under TILA is **GRANTED**.

## <u>TCPA</u>

In his Proposed Amended Complaint, Plaintiff states that Defendants' act, policies, and

practices constitute unfair or deceptive acts or practices affecting the conduct of trade or

commerce in violation of the TCPA.[60] He also avers that Defendants committed deceptive acts

or made material misrepresentations or omissions in violation of Tenn. Code Ann. § 47-18-

104(a), (b)(5), and (b)(27).[61] In addition to alleging that Defendants' actions were willful and

knowing, Plaintiff stated that Defendants concealed their unfair and deceptive acts and practices

from him and that the deception continues to the present.[62] Plaintiff specifically points to

Defendants' "prolonged pretense of consideration of a loan modification, thereby discouraging

Plaintiff from seeking redress" and failing to advise Plaintiff about his eligibility to receive relief

under the Agreed Final Judgment between Countrywide and the Attorney General.[63]

The TCPA provides that "[u]nfair or deceptive acts or practices affecting the conduct of

any trade or commerce constitute unlawful acts or practices."[64] The TCPA contains a list of

---

[60] (Proposed Am. Compl. ¶ 108.)

[61] (*Id.* ¶ 109.)

[62] (*Id.* ¶ 110-111.)

[63] (*Id.* ¶ 111-112)

[64] Tenn. Code Ann. § 47-18-104(a).

different "unfair or deceptive acts or practices" which violate the TCPA.[65] Section 47-18-104(b)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship approval, status, affiliation, or connection that such person does not have."[66] Section 47-18-104(b)(27) prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person."[67] To recover under the TCPA, a plaintiff "must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . .'"[68] Thus, although the TCPA does not require reliance, plaintiffs are required to show that the defendant's wrongful conduct proximately caused their injury.[69] Because Section 47-18-104(b)(27) is broader than Section 47-18-104(b)(5), the Court will evaluate the sufficiency of

---

[65]    *Id.* § 47-18-104(b).

[66]    *Id.* § 47-18-104(b)(5).

[67]    *Id.* § 47-18-104(b)(27).  The Court notes that this section was amended in October of 2011 to read "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person; provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the Attorney General and Reporter and the director of the division."  2011 Pub. Acts, Ch. 510, § 15.  However, this amendment took effect on October 1, 2011, and the Public Act did not indicate that it should be applied retroactively.  *Id.* § 24 ("This act shall take effect October 1, 2011, the public welfare requiring it and shall apply to all liability actions for injuries, deaths[,] and losses covered by this act which accrue on or after such date.").  Therefore, the Court finds the controlling version of the TCPA to be the version in effect when Plaintiff filed suit in May of 2011, and it is unpersuaded by Defendants' argument that only the Attorney General could bring suit under § 47-18-104(b)(27).  (Defs.' Resp., D.E. # 22, at 5.)

[68]    *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)).

[69]    *White v. Early*, 211 S.W.3d 723, 741 (Tenn. Ct. App. 2006).

27

Plaintiff's Proposed Amended Complaint under Section 47-18-104(b)(5) unless it indicates otherwise. If a TCPA claim under Section 47-18-104(b)(5) would be valid or timely, the Section 47-18-104(b)(27) claim would also be valid or timely.

The defendant's conduct need not be willful or knowing, but if it is, the TCPA permits the trial court to award treble damages.[70] However, the TCPA specifically exempts from its coverage "[c]redit terms of a transaction which may be otherwise subject to the provisions of this part, except insofar as the Tennessee Equal Consumer Credit Act of 1974 . . . may be applicable.[71] Any claim under the TCPA must be "brought within one (1) year [of] a person's discovery of the unlawful act or practice."[72] Accordingly, the TCPA incorporates the discovery rule with this provision.[73]

In their Response to Plaintiff's Motion to Amend, Defendants argue that § 47-18-104(a) is inapplicable because it is a criminal statute making a violation of the TCPA a Class B misdemeanor.[74] Furthermore, they refer to their initial Motion to Dismiss and argue that Plaintiff's TCPA claim is both time-barred and exempt from coverage under the TCPA.[75] Finally, they note that Plaintiff's "special reference to the 'Agreed Final Judgment'" is

---

[70]    Tenn. Code Ann. § 47-18-109(a)(3).

[71]    *Id.* § 47-18-111(a)(3).

[72]    *Id.* § 47-18-110.

[73]    *Leonard v. Leo's Exterminating Servs., Inc.*, No. E2009-01398-COA-R3-CV, 2010 WL 2134145, at *12-13 (Tenn. Ct. App. May 27, 2010).

[74]    (Defs.' Resp., D.E. # 22, at 5.)

[75]    (*Id.* at 6.)

inapplicable to this case, as Plaintiff did not describe how Defendants' failure to disclose the Judgment's existence constitutes deceptive or unfair acts or practices.[76]

Because Defendants refer to only two of their four arguments in their Motion to Dismiss, the Court will confine its recitation to those arguments. In their Motion, Defendants argue that Plaintiff's claims are time-barred, as the TCPA carries a one-year statute of limitations.[77] Defendants argue that, under the discovery rule, a reasonable person would have been aware of any TCPA violation at the latest when the Mortgage amortized in July of 2009 or, at the earliest, when the loan payments first increased.[78] Additionally, they argue that this case is exempt from TCPA coverage, as Plaintiff's TCPA claim involves the credit terms of his initial loan, which he did not argue were covered under the Tennessee Equal Consumer Credit Act.[79]

In response, Plaintiff presents an extensive history of the TCPA's enactment and purpose before responding to Defendants' arguments.[80] Plaintiff points to Paragraph 99 of his original Complaint, which is Paragraph 101 of his Proposed Amended Complaint, and argues that he did not learn some of the most critical terms of his loan until the summer of 2010, thereby tolling the TCPA's statute of limitations until that time.[81] He also argues that his TCPA claim challenges actions which have continued until the filing of this lawsuit and that his claims are not time-

---

[76]    (*Id.*)

[77]    (Defs.' Mot., D.E. # 4-1, at 8.)

[78]    (*Id.* at 9.)

[79]    (*Id.* at 10.)

[80]    (Pl.'s Resp., D.E. # 16, at 8-11.)

[81]    (*Id.* at 14.)

barred.[82]  Additionally, he states that § 47-18-111(a)(3)'s exemption pertains to the terms of credit transactions rather than the deceptive conduct of parties to the credit transactions; accordingly, Plaintiff implies that deception leading to the formation of an agreement would not be exempted from the TCPA's coverage.[83]

In reply, Defendants reiterate their previous arguments and assert that Plaintiff's allegations primarily relate to the actions or inactions of Defendants before and during the origination of the Mortgage.[84]  Thus, they argue that a reasonable person would have discovered his or her cause of action when his or her loan payment increased for the first time or, at the very latest, when the Mortgage amortized in July of 2009.[85]  Thus, they argue that Plaintiff's TCPA claim is barred by the statute of limitations.

At the outset, the Court finds that Defendants' asserted exemption does not apply.  The Mortgage at issue is not "credit terms of a transaction which may be otherwise subject to the provisions of this part;" therefore, the exemption does not apply on its face.  Even if the Mortgage consisted of "credit terms," the Court finds that Plaintiff's TCPA claim does not relate to those terms itself; instead, it relates to Defendants' actions leading up to the signing of the Mortgage and then performance under the terms of the Mortgage.  Therefore, the Court finds that § 47-18-111(a)(3)'s exemption does not apply to Defendants.

---

[82]     (*Id.* at 15.)

[83]     (*Id.* at 16.)

[84]     (Defs.' Reply, D.E. # 17, at 4.)

[85]     (*Id.*)

Additionally, the Court finds that Plaintiff has raised TCPA claims related to two specific instances: Defendants' allegedly deceptive actions leading up to the signing of the Mortgage and its deceptive actions related to consideration of a loan modification. First, the deceptive acts leading up to the signing of the Mortgage are necessarily time-barred under the Court's analysis above. Plaintiff reasonably should have discovered any fraud or deception leading up to the signing of the Mortgage by May of 2006. Because the TCPA contains a one-year statute of limitations, Plaintiff would have had to sue by May of 2007 for this portion of his TCPA claim to be timely. Because he did not sue until May of 2011, his TCPA claim is barred by the statute of limitations. Therefore, this portion of Plaintiff's Motion to Amend the Complaint is **DENIED**, and Defendants' Motion to Dismiss this portion of his original Complaint is **GRANTED**.

Second, Defendants' deceptive actions related to consideration of a loan modification are not time-barred. The Proposed Amended Complaint alleges that Defendants' deceptive conduct related to the possibility of acquiring a loan modification under HAMP was ongoing at the filing of the Complaint in May of 2011. Therefore, any deceptive conduct alleged in that regard would not be time-barred. Accordingly, Plaintiff's Motion to Amend the Complaint is **GRANTED** in this regard, and Defendants' Motion to Dismiss is **DENIED**.

### Negligent Misrepresentation

Claims of negligent misrepresentation must be pled with the particularity required by the heightened pleading standard of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").[86] Intent and

---

[86]    *Girgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 856 (N.D. Ohio 2010). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

knowledge can be alleged generally under Rule 9(b).[87]  Rule 9(b) alerts "defendants 'as to the particulars of their alleged misconduct' so that they may respond."[88]  This heightened pleading standard prevents fishing expeditions, protects defendants' reputations from allegations of fraud, and narrows potentially wide-ranging discovery to relevant matters.[89]

As the Sixth Circuit has noted, "[t]o plead fraud with particularity, the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3), the defendant's fraudulent intent, and (4) the resulting injury."[90]  The elements of negligent misrepresentation require a plaintiff to establish that "the defendant supplied information to the plaintiff; that the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information; and the plaintiff justifiably relied on the information."[91]  The statute of limitations for negligent misrepresentation is three years, as contained in Tenn. Code Ann. § 28-3-105, and the statute begins to run when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof."[92]

---

[87]     *Id.*

[88]     *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *U.S.* ex rel. *Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007)).

[89]     *U.S.* ex rel. *SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008); *Bledsoe*, 501 F.3d at 503 n.11.

[90]     *Chesbrough*, 655 F.3d at 467 (quotation and internal punctuation omitted).

[91]     *Cato v. Batts*, No. M2009-02204-COA-R3-CV, 2011 WL 579153, at *6 (Tenn. Ct. App. Feb. 17, 2011).

[92]     *N.E. Knox Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 459 (Tenn. Ct. App. 2006).

In his Proposed Amended Complaint, Plaintiff states that Defendants and their agents supplied false information regarding the nature and terms of the Pay Option ARM loan offered to Plaintiff.[93]  He avers that he justifiably relied on these representations and that Defendants and their agents failed to exercise reasonable care or competence in communicating information to him.[94]

In their Response to Plaintiff's Motion to Amend, Defendants note that Plaintiff's Proposed Amended Complaint "merely add[ed] [Counts] relating to Negligent and Intentional Misrepresentation where he cites the elements of those causes of action without identifying which facts support those elements."[95]  Defendants challenge the specificity of these pleadings under Rule 9(b) and argue that the claim is barred by the statute of limitations.[96]  Because Defendants rely on arguments in their prior Motion to Dismiss, the Court will address those briefings as well.  In their Motion, Defendants argue that Plaintiff's negligent misrepresentation claim is barred by the three-year statute of limitations despite the application of the discovery rule.[97]  They point out that all of the facts regarding the Mortgage's payment structure were "discoverable and available to Plaintiff at the time of closing."[98]  They argue that any

---

[93]    (Proposed Am. Compl. ¶ 114.)

[94]    (*Id.* ¶ 115-116.)

[95]    (Defs.' Resp., D.E. # 22, at 6.)

[96]    (*Id.*)

[97]    (Defs.' Mot. to Dismiss, D.E. # 4-1, at 11.)

[98]    (*Id.*)

misrepresentation related to the Mortgage's terms would have taken place prior to the closing date of May 14, 2004, and that Plaintiff's claims are necessarily time-barred.[99]

In response, Plaintiff points to specific paragraphs of the original Complaint—which remain unchanged in the Proposed Amended Complaint—as satisfying Rule 9(b)'s requirements.[100]  In response to Defendants' statute of limitations argument, Plaintiff reminds Defendants that both the original and Proposed Amended Complaints state that he did not learn of the most egregious terms of the Mortgage until the summer of 2010, that his loan did not fully amortize until 2009, and that he made inquiries about why his payments were increasing but got no response.[101]  Accordingly, Plaintiff implies that he was reasonably diligent in his discovery of the misrepresentation and that his negligent misrepresentation claim is timely.

In reply, Defendants reiterate their previous arguments and note that despite Plaintiff's reference to specific paragraphs of the original and Proposed Amended Complaints, he still failed to state with specificity which material fact Defendants or their agents knew or should have known was false at the time of its representation.[102]  Additionally, Defendants imply that if Plaintiff had exercised reasonable care and diligence, he would have discovered any misrepresentation prior to the summer of 2010.[103]

---

[99]     (*Id.* at 12.)

[100]     (Pl.'s Resp., D.E. # 16, at 11-12, 17.)

[101]     (*Id.* at 17-18.)

[102]     (Defs.' Reply, D.E. # 17, at 5.)

[103]     (*Id.* at 5-6.)

The Court finds that Plaintiff's negligent misrepresentation claim is time-barred. Under the Court's analysis above, Plaintiff reasonably should have discovered any misrepresentation by May of 2006, which would have required him to file suit by May of 2009. Because he sued in May of 2011, his claims are barred by the statute of limitations. Therefore, the Court finds that amending Plaintiff's Complaint to include this claim would be futile, and Plaintiff's Motion to Amend the Complaint is **DENIED**. Accordingly, Defendant's Motion to Dismiss this claim is **GRANTED**.

### Intentional Misrepresentation

Intentional misrepresentation claims contain four elements:

> (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation['s] falsity—that the representation was made "knowingly" or "without belief in its truth," or recklessly without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation relates to an existing or past fact.[104]

Claims of intentional misrepresentation must be pled with the same heightened pleading standards under Rule 9(b) as negligent misrepresentation.[105] Similarly, intentional misrepresentation carries the same three-year statute of limitations.[106]

In his Proposed Amended Complaint, Plaintiff states language identical to that of his negligent misrepresentation claim. Plaintiff states that Defendants and their agents supplied false information regarding the nature and terms of the Pay Option ARM loan offered to

---

[104] *Murvin v. Cofer*, 968 S.W.2d 304, 310 (Tenn. Ct. App. 1997).

[105] *Girgis*, 733 F. Supp. 2d at 856.

[106] *Med. Educ. Assistance Corp. v. State* ex rel. *E. Tenn. State Univ. Quillen College of Med.*, 19 S.W.3d 803, 817 (Tenn. Ct. App. 1999) (citing *Alexander v. Third Nat'l Bank*, 915 S.W.2d 797, 799 (Tenn. 1996)).

Plaintiff.[107]  He avers that he justifiably relied on these representations and that Defendants and their agents failed to exercise reasonable care or competence in communicating information to him.[108]  In the original Complaint, Plaintiff relied upon the same facts as in his Proposed Amended Complaint, but he did not set out intentional misrepresentation as a separate Count.

In their Response to Plaintiff's Motion to Amend the Complaint, Defendants combine their argument regarding Plaintiff's negligent and intentional misrepresentation claims; as the Court explored those arguments above, it need not do so here.  However, because Defendants incorporate by reference their Motion to Dismiss, and their Motion to Dismiss contained separate sections for intentional and negligent misrepresentation, the Court will set forth the parties' briefing at the Motion to Dismiss stage regarding Plaintiff's intentional misrepresentation claim.

In their Motion, Defendants argue that Plaintiff's original Complaint did not specifically assert which material facts Defendant supplied upon which Plaintiff relied or which facts Defendants knew were false at the time of their representation.[109]  Furthermore, they state that the three-year statute of limitations has already run and that Plaintiff's intentional misrepresentation claim is untimely.[110]  In response, Plaintiff again relies on the specificity of the allegations in his Complaint, specifically paragraphs 7, 9, 10, 13, 43, 44, and 58, as proof that he

---

[107]   (Proposed Am. Compl. ¶ 118.)

[108]   (*Id.* ¶ 119-120.)

[109]   (Defs.' Mot. to Dismiss, D.E. # 4-1, at 12.)

[110]   (*Id.* at 12-13.)

pled his allegations of intentional misrepresentation with particularity.[111]  In reply, Defendants

reiterate the same arguments in their initial Motion.[112]

Just as Plaintiff's negligent misrepresentation claim is time-barred, his intentional

misrepresentation claim is barred by the statute of limitations as well.  Relying on the Court's

analysis above, the Court finds that amending Plaintiff's Complaint to include this claim would

be futile, and Plaintiff's Motion to Amend the Complaint is **DENIED**.  Accordingly,

Defendant's Motion to Dismiss this claim is **GRANTED**.

### **HAMP**

In their Response to Plaintiff's Motion to Amend the Complaint, Defendants point to

Paragraphs 95 and 96 of both Plaintiff's original and Proposed Amended Complaint as

suggesting that Plaintiff believed that he was eligible for a loan modification under HAMP.[113]

They argue that any additional claim Plaintiff is attempting to make under HAMP should not be

allowed, and they cite to their arguments in their Motion to Dismiss.[114]  Because the original and

Proposed Amended Complaint are identical with regard to Plaintiff's HAMP claim, the Court

will now turn to Defendants' Motion to Dismiss.

The original and Proposed Amended Complaint mention HAMP in Paragraphs 95 and

96, but Plaintiff does not list HAMP as a Count for Relief or mention it in his Preliminary

---

[111]    (Pl.'s Resp., D.E. # 16, at 18.)

[112]    (Defs.' Reply, d.E. # 17, at 6.)

[113]    (Defs.' Resp., D.E. # 22, at 7.)

[114]    (*Id.*)

Statement.[115]  Nevertheless, Defendants argue that any claim Plaintiff has asserted for a HAMP violation should be dismissed.  First, they assert that no private right of action exists under HAMP.[116]  Second, Defendants point out that Plaintiff is ineligible for relief under HAMP: to qualify for HAMP, a mortgage must have less than $729,750 in principal, and Plaintiff's Mortgage was initiated with $800,000 in principal.[117]  Moreover, a borrower must be in default to be eligible for HAMP, and Plaintiff's payments are current.[118]  Accordingly, Defendants submit that Plaintiff is ineligible for HAMP relief and can state no cause of action under HAMP.[119]

In response, Plaintiff states that he "has not attempted to raise a direct claim for violation of . . . Defendants' obligations under HAMP."[120]  Rather, Plaintiff mentioned HAMP in his Complaint to "assert that . . . Defendants did not fulfill their responsibilities under HAMP" as "support [for his] TCPA claims."[121]  In reply, Defendants assert that, despite Plaintiff's statements, "the Complaint is not clear as to why Plaintiff [pled] the requirements of HAMP and

---

[115]    (Compl. ¶ 95-96; Proposed Am. Compl. ¶ 95-96.)

[116]    (Defs.' Mot. to Dismiss, D.E. # 4-1, at 13.)

[117]    (*Id.* at 14.)

[118]    (*Id.* at 15.)

[119]    (*Id.*)

[120]    (Pl.'s Resp., D.E. # 16, at 19.)

[121]    (*Id.*)

[his] eligibility . . . for HAMP," and that lack of clarity merits dismissal under the standards of *Twombly* and *Iqbal*.[122]

In light of Plaintiff's clarification that he did not raise a direct claim for a HAMP violation in his original Complaint, the Court finds that Plaintiff's original Complaint did not contain a request for relief for a HAMP violation. As such, the original Complaint necessarily fails to state a claim for a HAMP violation, and Defendants' Motion to Dismiss Plaintiff's HAMP claim is **GRANTED**. Similarly, the Court also finds that the Proposed Amended Complaint does not contain a request to amend the original Complaint to include a HAMP claim. Therefore, any Motion made by Plaintiff to include a HAMP claim in his Proposed Amended Complaint is **DENIED**.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Amend the Complaint is **GRANTED IN PART AND DENIED IN PART**, and Defendant's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**. Plaintiff is requested to file his Amended Complaint as a separate docket entry.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 25th, 2012.

---

[122]    (Defs.' Reply, D.E. # 17, at 7.)